# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 04-1503

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

v.

ERIE BRUSH AND MANUFACTURING
CORPORATION,

*Respondent.*

_____

On Application for Enforcement of an Order
of the National Labor Relations Board
No. 13-CA-41318

_____

ARGUED SEPTEMBER 30, 2004—DECIDED MAY 2, 2005

_____

Before ROVNER, WOOD and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* The employees of Erie Brush and
Manufacturing Corporation ("Erie Brush") voted to accept
the Service Employees International Union, Local 1, AFL-
CIO (the "Union") as their exclusive collective-bargaining
representative. Erie Brush filed three objections to the
election. The NLRB held a hearing on the objections and
the Hearing Officer recommended that each objection be
overruled. A three-member panel of the NLRB agreed with
the Hearing Officer's assessment and certified the Union as

the exclusive collective-bargaining representative of an appropriate bargaining unit of Erie Brush's Fletcher Street plant in Chicago.[1] Subsequently, Erie Brush refused (and continues to refuse) to bargain with the Union, claiming the NLRB's certification of the Union was improper. The Union filed an unfair labor practice charge with the NLRB, and a three-member panel granted judgment in favor of the Union. The case is now before us on an application of the NLRB to enforce its December 31, 2003 Decision and Order. Because the NLRB properly certified the Union and correctly overruled the employer's objections to the election, we enforce the December 31, 2003 Decision and Order.

## I.

On December 3, 2002, the Union petitioned the NLRB (the "Board") for certification as the representative of an appropriate unit of Erie Brush's production and mainte-nance employees. The Board then conducted a secret ballot election on January 14, 2003. Of twenty-seven eligible voters, eighteen cast ballots for the Union, five cast votes against the Union and two ballots were challenged. A week later, Erie Brush filed three timely objections to the elec-tion. The first objection alleged that the Union threatened violence against any company employee who attempted to work during a strike against Erie Brush. According to the second objection, the Union threatened to charge a $250 initiation fee to those employees who voted against the Union in the election but not to those who voted for the

---

[1] The "appropriate unit," as stipulated by the parties was all full time and regular part-time production and maintenance employ-ees employed by Erie Brush at its facility currently located at 860 W. Fletcher Street in Chicago, but excluding all salesmen, office clerical employees and guards, professional employees and super-visors.

Union. The third objection asserted that the conduct of pro-Union employees created an atmosphere of fear and coercion that made a fair election impossible.

Because the objections raised substantial and material issues of fact, the Board conducted a hearing on February 13 and 14, 2003. Most of the witnesses were Spanish-speaking employees of Erie Brush, and they testified through an interpreter. The hearing officer was also fluent in Spanish, stating on the record that her Spanish was even better than her English. Tr. at 16. After hearing the testimony of nine witnesses, the hearing officer issued a Report on Objections, recommending that each of the employer's objections be overruled.

In support of the first objection, Erie Brush alleged that Union representative Oscar Sandoval told employees during a January 11, 2003 meeting that if there was a strike, the employees would surround the building and block the entrances. According to Erie Brush, Sandoval told the employees that workers who tried to enter the plant during a strike would have their car windshields broken and their tires slashed, and that if they still tried to enter, they would be taken for a ride and beaten. Erie Brush presented the testimony of Sergio Barraza, Javier Tapia and Luis Rodriguez Soto, three employees who were present at the January 11 meeting, in support of this charge. The Union countered with three other employees present at the meeting, Clemente Isidro, Carlos Santana and Sergio Moreno, as well as Union representative Sandoval. The hearing officer found that Barraza, Tapia and Rodriguez Soto were not credible in their accounts of the January 11 meeting. To the extent that their stories conflicted with the testimony of the Union's witnesses, she credited the version of events told by the Union's witnesses. She based her credibility finding for Barraza on changes in demeanor between direct and cross-examination, confrontational and impatient responses, reluctance to answer questions, outright evasiveness, facial expressions and

body language. She noted similar problems with Tapia's testimony, finding that his demeanor changed substantially from direct to cross-examination, when he suddenly struggled to understand questions and appeared irritated, uncooperative and unresponsive. The hearing officer observed that, on cross, Tapia seemed to be answering questions other than those asked so that he could make a particular point. In the case of Rodriquez Soto, the hearing officer found that he was reluctant to answer questions on both direct and cross-examination, that the few answers he gave were evasive or inconsistent with a prior affidavit, and that he admitted he was motivated to testify because he wanted to protect his job. The hearing officer instead credited the testimony of Sandoval and Santana, who both responded to direct and cross-examination in a thoughtful, calm and straightforward manner. Sandoval denied that he ever told employees to break windshields, slash tires or beat persons who tried to cross a picket line. Santana corroborated Sandoval's testimony, and because the hearing officer credited that testimony, she recommended that the first objection be overruled in its entirety.

On the second objection, the employer presented testimony from Margarita Salgado and Miroslava Onofre in addition to Barraza, Tapia and Rodriguez Soto. The hearing officer again found Barraza and Tapia not credible. She noted that Salgado testified with a great deal of prompting and thus she credited only those parts of the testimony that were not prompted by the employer's lawyer. She also credited Salgado's testimony to the extent it was corroborated by other credible witnesses. According to Salgado, Clemente Isidro called her numerous times to discuss the Union. He gave her a paper on which to write her name and social security number and told her that it was for the Union to know that she was with them. On another day, Isidro told her that those employees who voted against the Union would have to pay an initiation fee. Isidro also asked

Salgado to tell other female employees that workers who did not vote for the Union would have to pay an initiation fee. On the day of the election, Salgado told Onofre that she should vote for the Union to avoid paying the initiation fee. Salgado then told Isidro that Onofre was with the Union. Isidro called Salgado on her cell phone later that day when she was with Onofre. According to Salgado, both she and Onofre had their ears to the phone when Isidro repeated that he would let the Union know they were with the Union so that they did not have to pay an initiation fee. Salgado admitted on cross-examination that she never signed a Union card and that she never heard any other employees talk about an initiation fee. Onofre corroborated Salgado's testimony. She testified that Salgado told her on the day of the election that if she did not vote for the Union, they would charge her an entry fee. She also testified that she listened in on the telephone conversation between Salgado and Isidro on the day of the election, when Isidro told Salgado that he would tell the Union to put the women's names on a list so that they would not be charged an entry fee.

Erie Brush tried to establish that Isidro was an agent of the Union when he engaged in this pro-Union conduct. The hearing officer considered Isidro's actions on behalf of the Union to determine whether he generally could be considered an agent for all purposes or whether he was a "special agent" for certain limited purposes. The hearing officer found that Isidro made the first contact with the Union in November 2002 and arranged for the first Union meeting. The evidence revealed Isidro to be an active and vocal supporter of the Union who solicited Union cards, called employees at home to encourage them to join the Union, and talked to employees at the plant about joining the Union. Isidro obtained signatures on Union cards from four employees. Moreover, Sandoval relied in part on Isidro to inform him about what was going on at the plant. Isidro invited the employees to the first Union meeting but after

that, Sandoval called employees at home to invite them to additional meetings. Only Sandoval spoke at Union meetings and the Union did not confer on Isidro any authority to act on behalf of the Union. Finally, the hearing officer found that there was no evidence that Isidro's comments about initiation fees occurred in the context of soliciting Union cards or that he solicited Union cards from either Salgado or Onofre. Consequently, the hearing officer found that Isidro was neither an agent nor a special agent of the Union. The hearing officer thus evaluated Isidro's conversations about initiation fees as third party misconduct. She found that there was no evidence that Isidro's conduct extended beyond the two women who testified. The Union had clarified in a prior well-attended meeting that no one would be charged an entry fee whether or not they voted for the Union. The hearing officer therefore found that Isidro's conduct was insufficient to justify setting the election aside. In the alternative, she found that even if Isidro was an agent of the Union, his conduct was not objectionable because the election was secret and no reasonable employee would view a secret vote for the Union as a *quid pro quo* for a waiver of initiation fees. The hearing officer thus recommended that the second objection be overruled in its entirety.

On the third objection, two witnesses testified that Isidro threatened them. The hearing officer once again discredited the testimony of Barraza, who claimed that Isidro called him names, shoved him and threatened that he would kill him if he could not trust him. In addition to finding that Barraza was not credible, the hearing officer noted that there was no evidence that Isidro's threats were linked to any employee's views on the Union. Roberto Andraca testified that on the day of the election, Isidro walked down a narrow passage towards him with a menacing look on his face. Andraca stepped to the side and Isidro passed without incident. Isidro later called Andraca a name when he walked past a table where Isidro was working. The hearing

officer found that Isidro's conduct was not objectionable and that there was no evidence of a link between Isidro's alleged conduct and Andraca's stance against the Union. She therefore recommended that the third objection be overruled.

Erie Brush filed exceptions to the hearing officer's report. Thereafter, a three-member panel of the NLRB issued its Decision and Certification of Representative ("Decision"). The panel overruled all three objections, adopting many of the hearing officer's findings and recommendations, but modifying its rationale for overruling the second and third objections. For the first objection, the panel overruled the employer's objection for the reasons stated in the hearing officer's report. On the second objection, however, the panel found that it was irrelevant whether Isidro was an agent of the Union and whether his offer to waive initiation fees was objectionable under Supreme Court precedent because the record was insufficient to demonstrate that Isidro's conduct could have affected the election results. *See N.L.R.B. v. Savair Manufacturing Co.*, 414 U.S. 270 (1973). In particular, there was no credited evidence that Isidro discussed this offer with anyone other than Salgado and Onofre and no credited evidence that Salgado and Onofre disseminated those statements to others. Because the Union won the election by a vote of eighteen in favor, five opposed and two disputed votes, the statements to Salgado and Onofre could not have made a difference to the outcome. For that reason, the panel overruled the second objection. On the third objection, the panel found that whether or not Isidro was acting as an agent of the Union when he threatened Andraca, the record failed to establish that Isidro's actions were connected to the election or to Andraca's stance against the Union. Accordingly, the panel overruled the third objection and certified the Union as the exclusive collective-bargaining representative of the bargaining unit that we defined above.

Erie Brush nonetheless refused to bargain with the Union after the panel's decision, and the Union therefore filed an unfair labor practice charge with the Board, claiming the company violated 29 U.S.C. §§ 158(a)(5) and (1) by refusing to bargain with the Union. Erie Brush responded to the complaint by admitting its refusal to bargain but again disputing the propriety of the Board's certification of the Union. The Board issued a Decision and Order ("Order") granting summary judgment in favor of the Union, finding that Erie Brush's refusal to bargain violated the statute. The Board rejected Erie Brush's continuing contention that the election was invalid under *Savair* regardless of whether Isidro disseminated his promise to waive initiation fees for those who voted in favor of the Union. The Board again cited the lack of evidence of dissemination and the wide margin by which the Union won the election. The Board thus found that the Union was properly certified, and that Erie Brush's refusal to bargain with the Union was unlawful. The Board ordered Erie Brush: (1) to cease and desist from refusing to bargain with the Union and from interfering with employees in the exercise of rights guaranteed under Section 7 of the National Labor Relations Act; and (2) to bargain on request with the labor unit at Erie Brush and to post a notice to employees informing them of their rights.

## II.

In light of Erie Brush's continued refusal to bargain, the NLRB filed an Application for Enforcement of an Order of the National Labor Relations Board in this court. Erie Brush persists in its three objections to the election and certification of the Union as the exclusive collective-bargaining representative at the Erie Brush plant. In particular, Erie Brush contends that the Board erred: (1) in affirming the hearing officer's finding that employees were not threatened with adverse consequences for crossing a picket line; (2) in

concluding that the dissemination of Isidro's promise to waive Union initiation fees was insufficient to change the results of the election; and (3) in finding that Isidro's menacing conduct toward Andraca was not sufficiently shown to be related to Andraca's stance against the Union to affect freedom of choice in the election.

### A.

We will address the first and third objections together because both are largely matters of credibility. Our review of the Board's decision to certify a collective bargaining agent following an election is extremely limited. *N.L.R.B. v. Chicago Tribune Co.*, 943 F.2d 791, 794 (7th Cir. 1991), *cert. denied*, 504 U.S. 955 (1992). *See also Overnite Transp. Co. v. N.L.R.B.*, 104 F.3d 109, 112 (7th Cir. 1997) (review of the Board's determination is deferential). A Board-run repre-sentation election is presumptively valid. *Overnite Transp.*, 104 F.3d at 112; *Tempco Electric Heater Corp. v. N.L.R.B.*, 999 F.2d 1109, 1111 (7th Cir. 1993); *N.L.R.B. v. WFMT*, 997 F.2d 269, 274 (7th Cir. 1993). The party challenging the election as the formidable burden of demonstrating that the election is invalid, and that substantial evidence does not support the Board's decision. *WFMT*, 997 F.2d at 274; *Chicago Tribune*, 943 F.2d at 794. To meet this burden when the unlawful conduct is committed by union agents, the objecting party must show that unlawful acts occurred and that those acts interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election. *Overnite Transp.*, 104 F.3d at 113; *WFMT*, 997 F.2d at 974; *Chicago Tribune*, 943 F.3d at 794. When the objectionable conduct is the act of rank-and-file employees rather than union agents, the Board will overturn an election only if the conduct created such an atmosphere of fear and reprisal that the rational, uncoerced selection of a bargaining representative was rendered

impossible. *Overnite Transp.*, 104 F.3d at 113. We are obligated to affirm the NLRB's findings of fact and applications of law to fact if they are supported by substantial evidence on the record considered as a whole. *Uniroyal Technology Corp., Royalite Division v. N.L.R.B.*, 98 F.3d 993, 997-98 (7th Cir. 1996). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support the Board's conclusion. *Uniroyal*, 98 F.3d at 998. Congress intended to confer upon the Board broad authority to develop national labor policy and so we will uphold the Board's legal conclusions so long as they have a reasonable basis in the law. *Uniroyal*, 98 F.3d at 998.

For the first objection, Erie Brush alleged that the Union itself, through Sandoval, had threatened violence against persons attempting to cross a picket line in the event of a strike. The hearing officer found that the employer's witnesses were not credible and that Sandoval delivered no such threats. A three-member panel of the Board adopted the hearing officer's recommendation to overrule this objection. These credibility determinations are entitled to considerable deference and we will overturn them only in extraordinary circumstances. *Ryder Rental Truck v. N.L.R.B.*, 401 F.3d 815, 825 (7th Cir. 2005); *Dilling Mechanical Contractors, Inc. v. N.L.R.B.*, 107 F.3d 521, 524 (7th Cir.), *cert. denied*, 522 U.S. 862 (1997). The employer now argues that the hearing officer did not fully consider Sandoval's own testimony and that this testimony indicates that Sandoval did convey a threat. Erie Brush relies the following exchange during the company's cross-examination of Sandoval:

> Q. Did you say to them that you've got to make sure that they don't go past the picket line? Did you tell them that?
>
> A. At the time, they're going to take care over there, I say if somebody coming, talk to these people and explain

> to the people why the situation with this company, and you want the union and this is the reason how this company is paying to you, you know. And then, these people are going to be scared and they are going to walk away.

Tr. at 140. As we noted earlier, all of the employee-witnesses spoke Spanish and testified through an interpreter, which helps account for some of the stilted language in the transcript. The hearing officer was a front row observer for this testimony, giving her a far greater edge in making credibility determinations than we could ever hope to have in reviewing the black and white transcript. Erie Brush's claim that this exchange conclusively demonstrates that Sandoval threatened employees with violence is quite a stretch. We will presume the hearing officer considered all of the testimony, even if she did not recount it line by line in her decision. Having heard all of the testimony in context, the hearing officer determined no threat was conveyed. The hearing officer's credibility determinations were well-founded on assessments of the witnesses's body language, demeanor, evasiveness and other factors that we detailed above. This exchange on cross-examination is not an "extraordinary circumstance" that convinces us otherwise and thus we find the employer has failed to demonstrate that substantial evidence does not support the Board's decision on the first objection.

Turning to the third objection, the hearing officer found that Barazza, one of the employer's witnesses, was not credible in his claim that Isidro threatened him because he did not support the Union. The hearing officer credited the testimony of the other witness presented, Roberto Andraca, but found that Isidro's conduct was not objectionable and that there was no credible evidence linking Isidro's conduct to Andraca's stance against the Union. The Board concluded that, whether Isidro's conduct was evaluated as an agent of the Union or as a rank-and-file employee, it was not

objectionable conduct and was not shown to be linked to
Andraca's stance against the Union. As with the first
objection, we defer to the credibility determinations of the
hearing officer. With no credible evidence linking any of
Isidro's conduct to Andraca's anti-Union stance, the Board
was correct to overrule the third objection.

### B.

Erie Brush also argued that Isidro violated the Supreme
Court's dictate in *N.L.R.B. v. Savair Manufacturing Co.*,
414 U.S. 270 (1973), when he told Salgado and Onofre that
the Union would charge an initiation fee for workers who
voted against the Union. The same standards of review
apply to this second objection as applied to the first and
third objections discussed above. For the same reasons we
stated above, we will credit only those witnesses and only
that testimony that was credited by the hearing officer and
accepted by the Board on this issue. According to the cre-
dited testimony, Isidro called Salgado a number of times to
discuss the Union. He asked her to write her name and so-
cial security number on a piece of paper so that the Union
would know she was with them. Sometime later, he told her
the Union would charge an initiation fee to workers who
voted against the Union, and he asked her to pass this
information on to the other female employees at the plant.
Salgado told exactly one other person, Onofre, on the day of
the election. Neither Salgado nor Onofre told anyone else
about the initiation fee and Salgado expressly stated that
she never heard any other employees discuss an initiation
fee at any time. Although Isidro sought and obtained signed
Union cards from four other employees, he never solicited
Union cards from either Salgado or Onofre and they did not
sign Union cards before the election. The hearing officer
specifically found there was no evidence that Isidro's
statement about initiation fees was conveyed to anyone

other than Salgado and Onofre. Moreover, the Union had clarified in a meeting prior to Isidro's statements that the Union intended to waive initiation fees for all of the employees whether or not they voted for the Union. Finally, the hearing officer found that there was no evidence that Isidro's comments about initiation fees occurred in the context of soliciting Union cards from either Salgado or Onofre. The hearing officer also found that Isidro was neither an agent nor a special agent of the Union when he made these statements to Salgado and Onofre, and she therefore evaluated the conversations as third party misconduct. She found the misconduct did not warrant setting the election aside, noting that ballots were cast in secret and that no reasonable person would expect a waiver of fees in exchange for a secret ballot. The Board took a slightly different approach, finding that no matter whether or not Isidro was an agent of the union, his actions were insufficient to affect the outcome of the election. The Board therefore overruled the second objection.

In *Savair*, the union won a representation election by a vote of twenty-two to twenty. Prior to the election, the union circulated "recognition slips" (which the Court also refers to as "authorization cards") among employees. Employees who signed the slips before the election became members of the union. The national secretary-treasurer of the union told the employees at a meeting that those employees who signed the slips would not have to pay an initiation fee if the union was voted in. 414 U.S. at 272-74. The solicitation of signatures on the slips was done not by union officials but by rank-and-file employees authorized by the union to accomplish this task. The union argued that because the election was held by secret ballot, there was no harm in making this promise because even employees who signed the card could vote "no" without fear of having to pay the fee. The Court rejected this reasoning:

> Whatever his true intentions, an employee who signs a recognition slip prior to an election is indicating to other workers that he supports the union. His outward manifestation of support must often serve as a useful campaign tool in the union's hands to convince other employees to vote for the union, if only because many employees respect their co-workers' views on the union-ization issue. By permitting the union to offer to waive an initiation fee for those employees signing a recognition slip prior to the election, the Board allows the union to buy endorsements and paint a false portrait of employee support during its election campaign.

414 U.S. at 277. The Court remarked that this influence may well have been felt here where twenty-eight employees signed the slips before the election petition was filed with the Board and an additional seven or eight signed the slips before the election. The Court stated that the statutory policy of fair elections does not permit endorsements, either for or against the union, to be bought and sold in this manner. 414 U.S. at 277.

> In addition, while it is correct that the employee who signs a recognition slip is not legally bound to vote for the union and has not promised to do so in any formal sense, certainly there may be some employees who would feel obliged to carry through on their stated intention to support the union. And on the facts of this case, the change of just one vote would have resulted in a 21-21 election rather than a 22-20 election.

414 U.S. at 277-78. The Court concluded:

> If we respect, as we must, the statutory right of employ-ees to resist efforts to unionize a plant, we cannot assume that unions exercising powers are wholly benign towards their antagonists whether they be non-union protagonists or the employer. The failure to sign a recognition slip may well seem ominous to nonunion-

ists who fear that if they do not sign they will face a wrathful union regime, should the union win. That influence may well have had a decisive impact in this case where a change of one vote would have changed the result.

414 U.S. at 280-81. Thus, the Court identified two potential ill effects from an offer to waive initiation fees in exchange for signing a union membership card before an election. First, the waiver allowed the union to purchase endorsements that could serve as a useful campaign tool for the union. Second, employees who signed recognition slips might feel obliged to carry through on their promise to support the union, even in a secret election.

Erie Brush urges us to find that under *Savair*, Isidro's offer to Salgado and Onofre to waive an initiation fee in exchange for their votes rendered the election invalid. The Board notes that the Union's official, well-publicized position was a waiver of fees for everyone and that the record contains no evidence that Isidro's offer was disseminated to anyone beyond these two employees. Thus it could not have affected the outcome of the election, which the Union won by a vote of eighteen to five. Erie Brush contends that there is no requirement that the employer prove dissemination, and that the true evil here was not the purchase of these two votes but the Union's purchase of these workers' endorsements to create a false sense of support for the Union among other employees.

There are several factors that distinguish the instant case from *Savair* and we begin with the second rationale of *Savair* to illustrate the differences. Although Isidro asked the women to write down their names and social security numbers for the Union, neither worker signed a Union authorization card or recognition slip. Thus, neither woman joined the Union prior to the election and neither made an outward manifestation of support for the Union (except to

the extent that Salgado's conversation with Onofre could be considered a manifestation of support for the Union). Without an outward manifestation of support for the Union by these women, Isidro would have been unable to use their so-called endorsements to paint a false picture of support for the Union in order to influence other workers. To the extent he could have used their informal endorsement (if we consider their private statements to Isidro that they would vote for the Union to be an informal endorsement) to influence other workers to vote for the Union, the record demonstrates that discussion of Salgado and Onofre's promise never extended past these two workers according to the employer's own witnesses. The record is devoid of any evidence that Isidro or anyone at the Union used Salgado or Onofre's "endorsement" to create a false impression of employee support or to gather further support for the Union. Thus, on this record, the evil of purchasing endorsements discussed in *Savair* never came to pass.

This is consistent with our holding in the *WFMT* case, where a group of employees created a fund to cover the initiation fees for employees who could not afford to pay them. We found that, unlike the union's offer in *Savair*, the employee-organizers' offer to waive initiation fees was not a condition of an employee's joining the union before the election. *WFMT*, 997 F.2d at 277. Rather, because the fund was available for all employees in the bargaining unit, the offer to waive initiation fees did not rise to the level of unjustly allowing the union to buy endorsements and paint a false picture of employee support during the election campaign. *Id.* Here, too, there is no evidence that Isidro's offer to these two employees rose to the level of unjustly allowing the Union to buy endorsements and paint a false picture of Union support.

Erie Brush complains that it should not be required to prove dissemination, that under *Savair*, once an endorsement has been purchased, the evil effect is presumed. As we

discussed, neither affected employee formally or informally endorsed the Union. And this is not a case where the employer was required to prove dissemination. Rather this is a case where the employer's own witnesses testified that they were the only two people aware of this promise, supporting the inverse of the inference found in *Savair*. There is literally no credible evidence that Isidro or anyone from the Union attempted to parlay Salgado or Onofre's informal promise to vote for the Union into additional votes for the Union. Indeed, Onofre learned of the fee waiver on the day of the election, when her "endorsement" would have done the Union little good. The second rationale of *Savair* was premised on the ability of the Union to use an "outward manifestation of support" as a "useful campaign tool." *Savair*, 414 U.S. at 277. The record shows no more than a few private conversations where two workers agreed to vote for the Union in exchange for a fee waiver that they would have received in any case. There were no outward manifestations of support that Isidro or the Union could use or did use as campaign tools. Hence, the Board's finding that the rule of *Savair* was not violated was supported by substantial evidence. *See also N.L.R.B. v. River City Elevator Co., Inc.*, 289 F.3d 1029, 1032-33 (7th Cir. 2002) (the Court in *Savair* did not categorically prohibit unions from waiving initiation fees; rather such a waiver is permissible in an election campaign when it is available to all employees and is not conditioned upon pre-election support for the union).

We turn to the first rationale in *Savair*, that employees who promised to vote for the Union would feel obliged to carry through on that promise even in a secret election. That was certainly the case with Salgado and Onofre but contrary to *Savair*, this was not a close election where the shift of affected votes could have changed the outcome. Although Erie Brush maintains that the margin of victory was irrelevant to the Supreme Court's holding in *Savair*, a careful reading of the case demonstrates to the contrary

that the Court relied in part on the fact that only one vote would have shifted the result of the election. This reliance is consistent with the general rule that, even when the union itself engages in prohibited conduct, the courts typically look to the effect on the bottom line of the election in determining whether to uphold the results of the election. *Overnite Transp.*, 104 F.3d at 113; *WFMT*, 997 F.2d at 274; *Chicago Tribune*, 943 F.3d at 794 (when the unlawful conduct is committed by union agents, the objecting party must show that unlawful acts occurred and that those acts interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election). Even if we determine that Isidro was an agent of the Union and was engaged in unlawful conduct when he promised to waive initiation fees for those agreeing to vote for the Union, Erie Brush has not shown that the unlawful conduct materially affected the results of the election. Erie Brush's own witnesses testified that only two workers were influenced by Isidro's conduct. Recall that our review is limited and deferential to the Board, and that a Board-run representation election is presumptively valid. *Overnite Transp.*, 104 F.3d at 112; *Tempco*, 999 F.2d at 1111; *WFMT*, 997 F.2d at 274. *See also Overnite Transp.*, 104 F.3d at 112 (we are obligated to affirm the NLRB's findings of fact and its applications of law to fact if they are supported by substantial evidence on the record considered as a whole); *Uniroyal*, 98 F.3d at 997-98 (court must uphold NLRB's legal conclusions if they have a reasonable basis in the law). The employer has simply failed to provide sufficient credible evidence to overcome that presumption. Accordingly, the December 31, 2003 Decision and Order is hereby enforced.

ORDER ENFORCED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*