# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 15, 2012   Decided November 27, 2012

No. 11-1337

ERIE BRUSH & MANUFACTURING CORP.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 1,
INTERVENOR

———

Consolidated with 11-1416

———

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

———

*Irving M. Geslewitz* argued the cause and filed the briefs for petitioner.

*Zachary R. Henige*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

*Leslie Ward* argued the cause and filed the brief for intervenor.

Before: SENTELLE, *Chief Judge*, HENDERSON and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: Erie Brush & Manufacturing Corporation ("Erie") petitions for review of a National Labor Relations Board ("NLRB" or "the Board") decision finding that Erie violated section 8(a)(5) and (1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), (5). *See Erie Brush & Manufacturing Corp. and Service Employees International Union, Local 1*, 357 N.L.R.B. No. 46, 2011 WL 3860605 (Aug. 9, 2011) ("Board Decision"). NLRB cross-petitions for enforcement of its order. Erie challenges the Board's finding of unlawful refusal to bargain, arguing that the parties were at a bargaining impasse. Alternatively, Erie argues that even if we uphold the Board's finding of an unfair labor practice, the bargaining remedy imposed exceeded the Board's authority. Because we conclude that substantial evidence does not support the Board's decision, we grant the petition for review and vacate the Board's decision and order. We need not decide the challenge to the Board's remedy.

## I.  BACKGROUND

Erie manufactures washing and polishing brushes at its facility in Chicago, Illinois.  The Seventh Circuit enforced a previous NLRB order requiring Erie to recognize and bargain with the Service Employees International Union, Local 1 ("the Union") for at least one year.  *NLRB v. Erie Brush & Manufacturing Corp.*, 406 F.3d 795 (7th Cir. 2005).  Erie began negotiations with the Union on June 28, 2005.  At the parties' first meeting, the Union's chief negotiator, Charles Bridgemon, asked that the parties discuss noneconomic issues before economic ones, and Erie's chief negotiator, Irving M. Geslewitz, agreed.  Between June 28, 2005 and March 31, 2006, the parties met on eight occasions and reached agreement on all noneconomic issues except two: union security and arbitration of grievances.  The Union insisted on including union security and arbitration clauses in the contract.  Erie was equally committed to an open shop and opposed to arbitration.  During the meetings, Bridgemon repeatedly told Geslewitz that the Union had no room to compromise on union security or arbitration, calling those issues "make or break on [the] whole contract" and saying that the Union "can't work on these things" and "there wouldn't be a contract without a union security clause." Geslewitz was just as adamant, refusing to agree to a contract that contained union security or arbitration provisions.

At the March 31 meeting, Bridgemon repeated a previous offer to modify his position on arbitration if Geslewitz would agree to change the contract's no-strike provision, but Geslewitz again declined the offer.  Bridgemon, according to his own testimony, told Geslewitz that he felt the parties were at an impasse on union security and arbitration, and Geslewitz agreed.  Bridgemon suggested mediation, and Geslewitz said he would consult with Erie's president on the prospect of

mediation even though he saw no potential middle ground on those two issues.

The parties next corresponded in a series of emails, beginning on April 5, 2006, when Geslewitz wrote to Bridgemon that Erie would not agree to mediation because neither party was willing to compromise on union security or arbitration, rendering mediation futile. Over a month later, on May 10, Bridgemon responded and suggested they negotiate economic issues and come back to the noneconomic ones. On May 26, Geslewitz asked whether the Union's positions on union security or arbitration had changed, because otherwise further negotiations would be pointless. Bridgemon's May 31 response stated that he was "willing to continue to discuss the union security and arbitration issues with the local," and he again requested a meeting. Geslewitz's June 1 email asked whether Bridgemon had authorization to change his position and if so, whether he had a proposal to offer. A day later, Bridgemon said he had "some give on the arbitration issue" but not on union security, and declined to provide a proposal. Geslewitz responded that it was still pointless to meet unless union security was on the table, and that he wanted more information in the form of a proposal.

Nine days later, on June 16, the Union threatened to file an unfair labor practice charge, and shortly thereafter, the parties scheduled a meeting for July 24. But on July 5, an employee who was a member of the bargaining unit delivered to Erie's president a handwritten document signed by 18 of 21 bargaining unit employees. The document stated (in Spanish) that the employees of Erie (most of whom have Spanish surnames) did not want to be represented by the Union. Based upon this petition, Geslewitz informed Bridgemon that Erie was withdrawing recognition and canceling the July 24 meeting.

After the Union brought unfair labor practice charges, the Board's General Counsel issued a complaint. An NLRB Administrative Law Judge ("ALJ") found that Erie had violated section 8(a)(5) and (1) by refusing to bargain with the Union between May 10 and June 21, 2006. Board Decision at 12 (ALJ Op.). The ALJ held that this refusal to bargain tainted the employees' decertification petition, so that Erie's withdrawal of recognition of the Union also violated section 8(a)(5) and (1). *Id.*

Erie filed exceptions to the ALJ's findings. A divided Board affirmed the ALJ's findings and order with only minor modifications. *See id.* at 1–5 (Board Op.). Member Hayes dissented from the Board's decision, stating that because the parties were at a bona fide impasse on union security and arbitration, he would reverse the ALJ's finding of unlawful refusal to bargain. *Id.* at 9 (Dissenting Op.).

As a remedy, the Board ordered Erie to cease and desist from refusing to bargain. *Id.* at 4–5 (Board Op.), 13 (ALJ Op.). The Board ordered Erie to recognize and bargain with the Union as the exclusive bargaining representative of Erie employees for at least six months. *Id.* Finally, the Board required Erie to physically post and electronically distribute a notice announcing that Erie would no longer engage in violations of the Act. *Id.*

Erie petitions this court for review, arguing that the Board's finding of unlawful refusal to bargain was not supported by substantial evidence in the record. In addition, Erie challenges the propriety of the Board's affirmative bargaining order.

## II. DISCUSSION

Section 8(a)(5) of the Act prohibits an employer from "refus[ing] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The obligation to "bargain collectively" requires "the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to . . . the negotiation of an agreement," but it "does not compel either party to agree to a proposal or require the making of a concession." *Id.* § 158(d). The bargaining obligation is suspended temporarily when the parties reach a lawful impasse. *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 232 (D.C. Cir. 1996). A lawful impasse "occurs when 'good faith negotiations have exhausted the prospects of concluding an agreement.'" *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1114 (D.C. Cir. 2001) (quoting *Taft Broadcasting Co.*, 163 NLRB 475, 478 (1967)). In other words, impasse exists if the parties "are warranted in assuming that further bargaining would be futile." *Id.* (quoting *Wycoff Steel, Inc.*, 303 NLRB 517, 523 (1991)) (internal quotation mark omitted). A violation of section 8(a)(5) results in a derivative violation of section 8(a)(1), which makes it unlawful for an employer "to interfere with . . . employees in the exercise of" their section 7 rights. 29 U.S.C. § 158(a)(1); *see id.* § 157; *Wayneview Care Center v. NLRB*, 664 F.3d 341, 347 n.1 (D.C. Cir. 2011).

This court must affirm Board findings if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). Though our review of NLRB decisions is "highly deferential," *Parsippany Hotel Management Co. v. NLRB*, 99 F.3d 413, 419 (D.C. Cir. 1996), we will not "merely rubber-stamp NLRB decisions." *Avecor, Inc. v. NLRB*, 931 F.2d 924, 928 (D.C. Cir. 1991). Indeed, we bear the "responsibility to examine carefully both the Board's

findings and its reasoning." *Id.* (quoting *Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35, 42 (D.C. Cir. 1980)).

With this responsibility in mind, we turn our attention to the Board's finding that Erie unlawfully refused to bargain with the Union. Erie objects to this finding, arguing that the parties were at a bargaining impasse on March 31, 2006, after their final in-person meeting. After review of the record, we conclude that the record evidence not only does not support the Board's finding, but uniformly supports Erie's position.

Impasse on a single critical issue can create an impasse on the entire agreement. *See CalMat Co.*, 331 NLRB 1084, 1097 (2000). A party asserting impasse based on a single issue must show that: first, a good-faith bargaining impasse actually existed; second, the single issue involved was critical; and third, "the impasse on this critical issue led to a breakdown in the overall negotiations." *Id.* The Board does not dispute that Erie established the second *CalMat* factor: union security was a critical issue. *See* Board Decision at 2; Resp't Br. at 26.

On the first factor, the Board found that Erie failed to establish the existence of a good-faith bargaining impasse before May 10. The Board explained that Bridgemon's suggestion of mediation on March 31 "show[ed] that he did not believe that further bargaining over either issue would be futile." Board Decision at 2. The Board took Bridgemon's promise to continue discussing the issues with the Union as evidence that the Union's positions on union security and arbitration were "gradually softening." *Id.* at 3.

The Board's finding of no impasse on union security or arbitration, however, is unsupported by substantial evidence. Considerations bearing on the existence of an impasse include

"the bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations." *TruServ*, 254 F.3d at 1114 (quoting *Taft*, 163 NLRB at 478) (internal quotation marks omitted). In this case, the evidence overwhelmingly points to the existence of an impasse on March 31. The parties had negotiated over a period of ten months, and had agreed to discuss noneconomic issues before moving on to economic ones. At no point during the ten month negotiation did either party propose a compromise on union security or arbitration that was acceptable to the other party. The Board did not rely on any bad faith by the parties, *see* Resp't Br. at 26 n.8, and it did not question the importance of union security or arbitration. Both parties understood bargaining to be at an impasse on March 31: Bridgemon, the Union's bargaining representative, explicitly stated that he viewed the negotiations as being at an impasse, and Geslewitz, the company's representative, agreed.

The Board pointed to two pieces of evidence in its finding of no impasse. First, the Board took Bridgemon's suggestion of mediation to mean that Bridgemon considered further bargaining on union security and arbitration potentially productive. But we have held that "a vague request by one party for additional meetings, if unaccompanied by an indication of the areas in which that party foresees future concessions, is . . . insufficient to defeat an impasse where the other party has clearly announced that its position is final." *TruServ*, 254 F.3d at 1117. On March 31, Bridgemon offered no possibility of future concessions on union security or arbitration. In fact, quite to the contrary: Bridgemon explicitly stated that the parties were "at impasse" on union security and arbitration, told Geslewitz that he had

no room to compromise on those issues, and suggested an arbitration proposal that Erie had already repeatedly rejected. Even assuming the Union's recycling of an already-declined arbitration proposal constituted a "softening" of its position on arbitration, the Union had not budged on union security as of March 31. We agree with the Board's dissenting member that the "mere invocation" of mediation does not "somehow magically ward[] off a deadlock." Board Decision at 8 (Dissenting Op.).

Second, the Board relied upon Bridgemon's statement that he would continue discussing the issues with the Union. *Id.* at 3 (Board Op.). But Bridgemon made no such statement on March 31. Bridgemon made a promise to continue discussing the issues with the Union on March 3, but on March 31, he made no such promise, and stated that he considered the negotiations at an impasse. Bridgemon made a similar promise on May 31, but we have recently reiterated that the Board cannot rely on a party's "post-impasse conduct" to find no impasse. *Laurel Bay Health & Rehabilitation Center v. NLRB*, 666 F.3d 1365, 1375 (D.C. Cir. 2012). Even if Bridgemon had made a contemporaneous promise, a negotiating agent's bare promise to continue discussing with his principal the topics of negotiations does not imply any moderation in the party's position. *See id.* (finding impasse where the union representative's statements "did not actually commit the [u]nion to a new position or contain any specific proposals" (quoting *Serramonte*, 86 F.3d at 233) (internal quotation marks and alterations omitted)).

Before the court, counsel for the NLRB attempts to distinguish *TruServ*, in which we found impasse even though the union disagreed that the parties were at impasse, *TruServ*, 254 F.3d at 1117–18, on the ground that "the Union here did more than simply say the parties weren't at impasse." Resp't

Br. at 23. NLRB's position is undermined by the inconvenient fact that the Union here not only did not say that the parties "weren't at impasse" on March 31, its representative said — out-loud and in-person — that they *were* "at impasse." This fact makes it even more obvious than it was in *TruServ* that the parties were at impasse. Thus, the Board's finding regarding the first *CalMat* factor, that no good faith impasse existed, is not supported by substantial evidence in the record, for the evidence "practically shouted impasse" on March 31. *Laurel Bay*, 666 F.3d at 1375 n.13.

Turning our attention to the third *CalMat* factor, whether the critical issue impasse led to an overall breakdown in negotiations, the Board found that even if the parties had reached a good faith impasse on union security or arbitration, Erie failed to show that the impasse led to a breakdown in negotiations. Board Decision at 4. Once again, substantial evidence does not support this finding. Each party made clear throughout the negotiations leading up to March 31 that it would not sign a contract that adopted the other party's position on union security. Both parties considered union security "make or break" on the entire contract. As in *CalMat*, the critical issue "pervaded the negotiations" and the parties' "positions never changed." 331 NLRB at 1098. The Board's claim that one of the parties would decide to change its position on union security "was not based on the record evidence; rather, the Board relied on its intuitive belief that, upon further bargaining, each side would have made additional concessions." *TruServ*, 254 F.3d at 1116. Such rank speculation cannot form the basis of a sound administrative finding, for we have emphasized that "each party, not the Board, determines at what point it ceases to be willing to compromise." *Id.* "You never know" is no substitute for substantial evidence.

At oral argument, the Union pressed the position that impasse cannot be found if the parties have not negotiated over economic issues. But the Board expressly refused to rest its decision on that proposition. Board Decision at 4 n.8. Though we seriously doubt the correctness of the Union's position, we need not reach that issue. "The courts may not accept appellate counsel's *post hoc* rationalization for agency action; *Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (citing *SEC v. Chenery*, 332 U.S. 194, 196 (1947)); *see also Jochims v. NLRB*, 480 F.3d 1161, 1169 (D.C. Cir. 2007).

All record evidence supports the proposition that the parties' diametrically opposed positions on union security "presented . . . an insurmountable obstacle to an agreement." *Richmond Electrical Services, Inc.*, 348 NLRB 1001, 1003 (2006). Because "the parties' failure to agree on this issue destroyed any opportunity for reaching a . . . collective-bargaining agreement," *CalMat*, 331 NLRB at 1098, the impasse on union security led to a breakdown in overall negotiations. Therefore, the record evidence clearly demonstrates that Erie met its burden of showing that the parties were at an impasse on the critical issue of union security on March 31, 2006.

The Board found that "even if the parties were at a momentary impasse . . . , it was broken well before [Erie] finally agreed in late June to resume bargaining." Board Decision at 3 n.7. This finding is not supported by substantial evidence. An impasse is considered broken only if "the party asserting that the impasse has been broken" points to "substantial evidence in the record that establishes *changed circumstances* sufficient to suggest that future bargaining

would be fruitful." *Serramonte*, 86 F.3d at 233. According to the Board, Bridgemon's assurance on May 31 that he would continue discussing union security and arbitration with the Union showed changed circumstances sufficient to break the impasse. But this communication is entirely inadequate to break the impasse. It did not "commit[] the Union to a new position or contain[] any specific proposals." *Id.* ("[A] party's 'bare assertions of flexibility on open issues and its generalized promises of new proposals'" do not represent "'any change, much less a substantial change' in that party's negotiating position." (quoting *Civic Motor Inns*, 300 NLRB 774, 776 (1990))). A negotiator's promise to do that which he has already and always done — discuss the bargaining issues with his principal — offers nothing more than "a handful of air," *id.*, and demonstrates no change in circumstances.

The Board also relied upon Bridgemon's June 2 statement that he had room to move on arbitration to show changed circumstances. First, this communication regarding arbitration self-evidently fails to show changed circumstances regarding the parties' impasse on the critical issue of union security. In fact, Bridgemon's June 2 email stated that he did not "have any give" on union security. Second, Bridgemon's communication did not actually demonstrate changed circumstances on any impasse over arbitration. In the June 2 email, Bridgemon wrote: "I do have some give on the arbitration issue . . . [, but] I don't have a counter[-proposal] at this point." This statement constitutes a "bare assertion[] of flexibility" devoid of any specific proposals and is insufficient to break a bargaining impasse. *Id.* In short, the Board's finding that the Union established changed circumstances sufficient to break any impasse is unsupported by substantial evidence in the record.

Because Erie and the Union were at a lawful impasse on at least the critical issue of union security from March 31 through the end of the parties' relevant communications, Erie was relieved of the duty to bargain during that time period. *See id.* at 232 ("[A] good-faith impasse in negotiations temporarily suspends the duty to bargain."). Thus, Erie did not unlawfully refuse to bargain. The Board's decision finding that Erie violated section 8(a)(5) and (1) was not supported by substantial evidence in the record.

Erie argues alternatively that the Board erred in imposing a bargaining order as a remedy and reminds us that we have often told the Board that such an order is an extraordinary remedy that may not be imposed in run-of-the-mill cases. *See Vincent Industrial Plastics, Inc. v. NLRB*, 209 F.3d 727, 738 (D.C. Cir. 2000). While this proposition is true enough, we have no occasion to examine the question in the present case, as our decision on the merits issue of impasse moots any issue as to the propriety of remedy. Nor need we discuss the Board's cross-petition for enforcement of the order since our merits decision renders that petition moot.

### III. CONCLUSION

For the foregoing reasons, we grant the petition for review, vacate the Board's decision and order, and deny the Board's cross-petition for enforcement.

*So ordered.*