# Illinois Official Reports

## Appellate Court

---

***Department of Central Management Services v. Illinois Labor Relations Board,***
***State Panel*, 2018 IL App (4th) 160827**

---

| | |
|---|---|
| Appellate Court Caption | THE DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, Petitioner, v. THE ILLINOIS LABOR RELATIONS BOARD, STATE PANEL; and THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPOYEES, COUNCIL 31, Respondents.–THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPOYEES, COUNCIL 31, Petitioner, v. THE ILLINOIS LABOR RELATIONS BOARD, STATE PANEL; and THE DEPARTMENT OF CENTRAL MANAGEMENT SERVICES Respondents. |
| District & No. | Fourth District<br>Docket Nos. 4-16-0827, 4-17-0127 cons. |
| Filed | October 23, 2018 |
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, State Panel, Nos. S-CA-16-087, S-CB-16-017. |
| Judgment | Board decision vacated and remanded for further proceedings. |
| Counsel on Appeal | Thomas S. Bradley, Mark W. Bennett, and David A. Moore, Special Assistant Attorneys General, of Laner Muchin, Ltd., of Chicago, for petitioner/respondent Department of Central Management Services. |

Melissa J. Auerbach and Stephen A. Yokich, of Dowd, Bloch, Bennett, Cervone, Auerbach & Yokich, of Chicago, for petitioner/respondent American Federation of State, County & Municipal Employees, Council 31.

Joel A. D'Alba, of Asher, Gittler & D'Alba, Ltd., of Chicago, for *amicus curiae* Illinois AFL-CIO.

Tamara L. Cummings and John R. Roche Jr., of Western Springs, for *amicus curiae* Illinois Fraternal Order of Police Labor Council.

Gilbert A. Cornfield and Elisa Redish, of Cornfield & Feldman LLP, and Nick Christen, both of Chicago, for *amici curiae* Illinois Federation of Teachers *et al.*

| Panel | JUSTICE DeARMOND delivered the judgment of the court, with opinion. |
| --- | --- |
| | Justices Holder White and Steigmann concurred in the judgment and opinion. |

## OPINION

¶ 1    In December 2015, the State of Illinois Department of Central Management Services (CMS or the State) and the American Federation of State, County and Municipal Employees, Council 31 (AFSCME or Union) began negotiations for a new 2015-19 collective bargaining agreement (CBA). On January 8, 2016, CMS declared an overall impasse and submitted its last, best, and final offer. Both parties filed complaints with the state panel of the Illinois Labor Relations Board (ILRB), alleging unfair labor practices under the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 2014)). The charges were investigated in accordance with section 11 of the Illinois Public Labor Relations Act, and the executive director of the ILRB issued complaints for the hearing on the charges. 5 ILCS 315/11 (West 2014). After consolidation, an administrative law judge (ALJ) conducted an exhaustive 25-day hearing on the matter. The ALJ issued a 250-page "Recommended Decision and Order," which recommended partial implementation by CMS of their last, best, and final offer on certain issues and sending the parties back to the bargaining table on other issues. The ILRB adopted the ALJ's ruling, in part, dismissed certain portions of the amended complaint against CMS, and rejected what it characterized as "the ALJ's package-by-package analysis of the question of impasse." They reversed the ALJ's finding that the parties were not at overall impasse; adopted, for the first time, the National Labor Relations Board's (NLRB) "single critical issue" impasse test; and permitted CMS to implement its last, best, and final offer. The ILRB further

ordered CMS to provide information previously requested by the Union and required them to continue bargaining on unresolved issues.

¶ 2 On appeal, CMS argues the ILRB erred in finding CMS committed unfair labor practices by (1) disregarding or failing to comply with information requests both before and after impasse, (2) finding certain CMS proposals resulted in the waiver of certain statutory rights, and (3) holding AFSCME did not repudiate the "Tolling Agreement" in violation of their duty to bargain in good faith. Conversely, AFSCME contends the ILRB erred by (1) allowing CMS to substitute affidavits for live direct-examination testimony at the hearing; (2) applying, for the first time, the "single critical issue" impasse test rather than the long-used, five-factor *Taft* test (*Taft Broadcasting Co.*, 163 N.L.R.B. 475 (1967)) to conclude impasse had, in fact, been reached; (3) failing to find CMS engaged in unlawful direct dealing with bargaining unit employees; and (4) failing to find CMS bargained in bad faith.

## I. BACKGROUND

¶ 4 The parties in this case have successfully negotiated CBAs for over 40 years. CMS is the largest public sector employer and AFSCME is the largest combined bargaining unit in the state. Over the course of their history of collective bargaining, AFSCME has negotiated more than two dozen CBAs with the administrations of six different governors. During that time, they have negotiated successor CBAs before the expiration of the existing CBA on all but three previous occasions. This was the fourth.

¶ 5 Beginning with the traditional joint labor/management meeting in December 2014, the parties engaged in collective bargaining from February 2015 until January 8, 2016, having agreed to await the inauguration of a new governor before starting. Over a period of 67 days, they conducted 24 bargaining sessions, with a federal mediator present most of the time after June 2015. The ALJ noted these negotiations were different from the previous practice of the parties for a number of reasons, not the least of which was the financial circumstances of the state.

¶ 6 At the December meeting, the State's prelude to bargaining included reminding the Union there was an approximate $6.4 billion backlog in unpaid bills, a budget deficit of approximately $1.6 billion, and a projected fiscal year 2016 budget deficit of $5 billion. In addition, there was an amount of $111 billion in unfunded pensions. Pension payments and financing accounted for approximately 25% of the State's general revenue fund expenditures at the start of negotiations. The Governor's Office of Management and Budget (GOMB) and the Department of Revenue in their three-year projection calculated a budget deficit for fiscal year 2016 of approximately $6.2 billion, $5.9 billion for fiscal year 2017, and $5.6 billion for fiscal year 2018. The ALJ noted there was, as of yet, no legislative solution to the $1.6 billion deficit in the budget, and the GOMB had projected the bill backlog to increase to $10.6 billion by the end of fiscal year 2016. As a result, the State had experienced rating downgrades by Moody's Investor Service and Fitch Ratings, two bond credit rating agencies, which resulted in greater costs for the State in its attempt to raise revenue through bond sales.

¶ 7 At that same meeting, the State's spokesperson said health care and pensions were two of the most fundamental financial issues affecting the budget. The Union's response was to encourage the State to reinstate the temporary tax increase passed by the Illinois General Assembly in 2011, which was due to end automatically on January 1, 2015; tax the wealthy; and support a tax structure placing greater responsibility for taxes on those who had higher

incomes. Unlike previous negotiations, the Union did not come forward with any proposals at that time. They said this was due to the fact that a new administration would be taking over and there was no reason to provide proposals to the outgoing governor's staff.

¶ 8    As a result of the upcoming inauguration in the middle of January 2015, the State cancelled any meetings for negotiations until February, thereby starting later than usual. In addition, unlike previous negotiations, it took the parties four bargaining days and seven proposals just to iron out ground rules. The rules proposed by CMS were identical to those used in previous negotiations; however, the Union wanted to add three more provisions: (1) the parties would bargain in good faith toward a successor CBA, (2) CMS would recognize AFSCME as the exclusive bargaining representative, and (3) all proposed modifications to the CBA would be made exclusively to the Union and not made to any other party. The State objected, contending these provisions were unnecessary and eventually saying they were willing to proceed without ground rules, if need be. On February 26, 2015, the parties agreed to the ground rules, incorporating the Union's first proposal only.

¶ 9    The ALJ's written recommendation identified other aspects of the negotiations that were atypical to the bargaining history of the parties: (1) the fact that the first substantive proposals were not presented until February 27, 2015; (2) the proposals were by the State and not the Union; (3) the Union did not present initial noneconomic proposals until March 18, 2015; and (4) the State was the first to submit economic proposals, doing so on May 13, 2015, while the Union waited to submit their initial comprehensive economic package on June 17, 2015.

¶ 10    As a result of these delays, the parties were within 13 days of the June 30, 2015, termination date for the previous CBA before trading economic packages. The parties negotiated the first of three "Tolling Agreements" on June 25, 2015, to address the inordinate delay in substantive negotiations. Per the first "Tolling Agreement," the parties agreed to negotiate in good faith to reach a successor CBA and abide by all legal obligations while doing so. Additional conditions of the two subsequent "Tolling Agreements," negotiated in July 29 and September 9, 2015, established the procedure of allowing for either a mutual acknowledgement of an impasse or agreeing to submit the matter to the ILRB. The last "Tolling Agreement" included language by the parties acknowledging their willingness to "continue meeting and negotiating in good faith" for a successor agreement and agreeing to allow the "Tolling Agreement" to continue until "impasse is reached" by mutual agreement of the parties or resolution of the impasse issue by the ILRB.

¶ 11    The first substantive proposal presented by the Union on February 27, 2015, after signing the ground rules, related to subcontracting/privatization. Unlike their other proposals, this one did not identify the contract provisions to which it related, was intended to replace, or amend but was, in the words of CMS's chief negotiator, more of a "policy statement." It contained broad language seeking to prevent the State from turning work over to companies seeking to make "excessive profits at the expense of service quality, public accountability, or fair treatment of employees." The Union's proposal also sought to prohibit privatization of state work as a way to "deny employees the right to union representation, to drive down employee wages and benefits, or to otherwise diminish the rights of employees." According to the Union representative, this was their idea of a way to start negotiations off on a better foot and build a relationship.

¶ 12    The State's response was to submit their first series of noneconomic issues, which sought to make a number of changes to existing contract language by either eliminating or restricting a

- 4 -

variety of Union or employee contractual rights. The State contended it was seeking to add "efficiency and flexibility" to State services as an aid to reduce the costs of operation. It was these two proposals, along with the Union's belief the new governor was intent on "busting" the Union, that set the tone for negotiations over the next 11 months.

¶ 13     Through the bargaining sessions, the parties reached an agreement on various provisions of the 2015-19 CBA, such as article XXXII, "Wages," and a grievance procedure package. Despite movement in some areas, the parties failed to reach an agreement in major areas such as subcontracting, health care, and wages prior to January 8, 2016.

¶ 14     During the January 8, 2016, meeting, CMS declared an impasse and presented its last, best, and final offer to AFSCME. AFSCME denied the parties had reached an impasse. CMS stated the issue should be submitted to the ILRB, while AFSCME maintained it was unnecessary since an impasse had not yet been reached. In February 2016, AFSCME and CMS filed complaints, with CMS alleging AFSCME had repudiated the tolling agreement and AFSCME alleging CMS had engaged in unfair labor practices during the bargaining.

¶ 15     The hearing lasted for 25 days and the ALJ rendered her opinion finding, among other things, the parties bargained in good faith, had reached an impasse on some but not all bargaining proposals, and CMS committed some unfair labor practices by not fulfilling information requests by AFSCME. The parties reached agreements on (1) ground rules; (2) article XXXIV, "Personnel Files"; (3) article XXVII, "Evaluations"; (4) article XXXI, "Miscellaneous"; (5) article XXXII, "Wages"; (6) "Classifications"; (7) "Integrity of the Bargaining Unit"; (8) "Miscellaneous Pay Provisions" package; (9) "Hours of Work and Overtime" package; (10) another miscellaneous package; and (11) "Grievance Procedure and Union Business" package. The unresolved packages were (1) "Wages"; (2) "Health Insurance"; (3) "Subcontracting"; (4) "Layoffs"; (5) "Outstanding Economics" package; (6) "Vacation, Holiday Scheduling, and Leaves of Absences"; (7) "DOC/DJJ Roll call"; (8) "Health and Safety Outstanding Issues"; (9) "Mandatory Overtime"; (10) "Non-Discrimination, Upward Mobility, and Filling of Vacancies"; (11) "Management Rights/Fair Share"; and (12) "Semiautomatic/ Classification in-series Advancement." The ALJ believed there was an impasse on the issues of (1) "Wages"; (2) "Health Insurance"; (3) "Subcontracting"; (4) "Vacation, Holiday Scheduling, and Leaves of Absences"; (5) "DOC/DJJ Roll call"; (6) "Mandatory Overtime"; (7) "Non-discrimination, Upward Mobility, and Filling of Vacancies"; and (8) "Management Rights/Fair Share." The ALJ determined there was no impasse on (1) "Layoffs," (2) "Outstanding Economics" package, (3) "Health and Safety Outstanding Issues," and (4) "Semi-automatic/ Classification in-series Advancement."

¶ 16     The ALJ entered findings regarding what she considered to be the impediments to the resolution of some of the packages and the finding of an impasse, as well as proper implementation of the State's last, best, and final offer. On the issue of wages, there were certain legal impediments to impasse, according to the ALJ, since the State could not unilaterally impose its last, best, and final offer without causing a waiver of a statutory right to a pension calculation based on whole compensation and the State did not fulfill its obligation to provide certain outstanding information requests made by AFSCME. In regard to health insurance, the legal impediments to unilateral implementation were the same as those listed above; *i.e.*, imposition of the State's last, best, and final offer would result in a *de facto* waiver of a statutory right to subsidized health insurance and CMS's failure to provide requested

information to AFSCME. On layoffs, the ALJ said the parties were moving slowly but were making progress toward resolution. There was limited discussion on the "Outstanding Economics" package, and the ALJ said, as a result, she could not find the parties were at impasse. Additionally, the ALJ found a legal impediment to unilateral implementation was caused by the fact that such implementation would cause the waiver of the Union's statutory right to retiree health insurance. A legal impediment to bargaining on "Vacation, Holiday Scheduling," and "Leaves of Absences" was based on another outstanding information request. The ALJ found the parties were not at an impasse on "Health and Safety Outstanding Issues" because there was still positive movement in their positions. The legal impediment to the "Non-Discrimination, Upward Mobility, and Filling of Vacancies" package was an unfulfilled information request. The ALJ found, despite slow movement, the parties were at least still moving toward agreement on the "Semi-Automatic/Classification In-Series Advancement" package.

¶ 17    The ILRB affirmed some of the ALJ's findings, stating CMS had committed unfair labor practices by withholding information requested by AFSCME. However, the unfair labor practices did not preclude a finding of impasse on the single critical issue of subcontracting, which led to a breakdown of bargaining as a whole. The ILRB ruled CMS was entitled to implement its last, best, and final offer.

¶ 18    CMS appealed the ILRB's order to the Fourth District and AFSCME appealed to the First District. On motion by CMS, the cases were consolidated and now appear before this court. This appeal followed.

¶ 19                                II. ANALYSIS
¶ 20                                 A. Impasse
¶ 21    AFSCME argues the ILRB erred in implementing for the first time the "single critical issue" impasse test without giving an explanation for its departure from the *Taft* factors test. We agree.

¶ 22                            1. *Standard of Review*
¶ 23    This appeal involves an agency's interpretation of its enabling statute and regulations—questions of law that we review *de novo*. *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 16, 998 N.E.2d 1227. Though our review is *de novo*, "we afford substantial weight and deference to the interpretation given to the law by the administrative agency charged with its enforcement." *Acme Markets, Inc. v. Callanan*, 236 Ill. 2d 29, 39, 923 N.E.2d 718, 725 (2009).

¶ 24                    2. *ILRB and NLRB's Precedent on Impasse*
¶ 25    As the ALJ noted in her order, the question of impasse involves two separate issues: (1) whether further negotiations would be futile, even if ordered by the ILRB, and (2) whether there are any other matters that preclude finding the parties are at a legitimate impasse. In order to determine the existence of a true bargaining impasse, for decades, the ILRB had relied upon the *Taft* factors. See *American Federation of State, County & Municipal Employees*, 9 PERI ¶ 2040 (ISLRB 1993) (*County of Jackson*); *City of Peoria Municipal Employees Ass'n*, 11 PERI ¶ 2007 (ISLRB 1994); *American Federation of State, County & Municipal Employees*,

33 PERI ¶ 15 (ILRB State Panel 2016) (*City of East Moline*). In *Taft*, the NLRB recognized the determination of whether a bargaining impasse had been reached was a matter of judgment. *Taft*, 163 N.L.R.B. at 478. It listed the five factors considered relevant in reaching that decision: (1) the bargaining history of the parties, (2) the good faith of the parties in negotiations, (3) the length of the negotiations, (4) the importance of the issue or issues as to which there is disagreement, and (5) the contemporaneous understanding of the parties as to the state of negotiations. *Taft*, 163 N.L.R.B. at 478. The ILRB adopted these same five factors in *American Federation of State County & Municipal Employees*, 5 PERI ¶ 2001 (ISLRB 1988) (*Departments of Central Management Services & Corrections*).

¶ 26    Since deciding *Taft* in 1967, the NLRB has used the five *Taft* factors in the majority of cases where bargaining impasse was claimed. The NLRB has relied on the three- factor, single critical issue impasse test discussed in *CalMat Co.*, 331 N.L.R.B. 1084 (2000), less frequently. There, the NLRB held a party seeking to justify a claim that impasse on a single critical issue permitted implementation of its last, best, and final offer was required to show:

> "first, the actual existence of a good-faith bargaining impasse; second, that the issue as to which the parties are at impasse is a critical issue; third, that the impasse on this critical issue led to a breakdown in the overall negotiations—in short, that there can be no progress on any aspect of the negotiations until the impasse relating to the critical issue is resolved." *CalMat Co.*, 331 N.L.R.B. at 1097.

¶ 27    Prior to *CalMat Co.*, the NLRB held that an impasse occurs "after good[-]faith negotiations have exhausted the prospects of concluding an agreement." *Sierra Publishing Co.*, 291 N.L.R.B. 552, 554 (1988) (quoting *Taft*, 163 N.L.R.B. at 478). In *Sierra Publishing Co.*, the NLRB said, "The Board has long distinguished between an impasse on a single issue that would not ordinarily suspend the duty to bargain on other issues and the situation in which impasse on a single or critical issue creates a complete breakdown in the entire negotiations." *Sierra Publishing Co.*, 291 N.L.R.B. at 554. Most notably, however, the NLRB went on to say, "Only in this latter context *when there has been a complete breakdown in the entire negotiations* is the employer free to implement its last best and final offer." (Emphasis added.) *Sierra Publishing Co.*, 291 N.L.R.B. at 554. As examples of such circumstances, the NLRB cited *Taylor-Winfield Corp.*, 225 N.L.R.B. 457 (1976), and *Holmes Typography, Inc.*, 218 N.L.R.B. 518 (1975). In *Taylor-Winfield*, evidence indicated the parties had resolved almost all issues except items relating to economics and, most importantly, a pension proposal. After lengthy negotiations, neither party was willing to move on their existing proposal, and the chief negotiators for both sides testified they were of the opinion the parties had reached impasse and were far apart on their respective proposals. In *Holmes Typography*, the parties were found to have reached impasse once it became evident neither side was moving on the issues of wages and workweek hours, which resulted in a strike. When the District of Columbia appellate court later noted how "[i]mpasse on a single critical issue can create an impasse on the entire agreement," it cited the NLRB's decision in *CalMat Co.* in support of that proposition. *Erie Brush & Manufacturing Corp. v. National Labor Relations Board*, 700 F.3d 17, 21 (D.C. Cir. 2012) (citing *CalMat Co.*, 331 N.L.R.B. at 1097). However, in *CalMat Co.*, the Board still found the party contending the existence of an impasse carried the burden, which required a fact-intensive analysis guided by the five factors in *Taft*. *CalMat Co.*, 331 N.L.R.B. at 1097-98. This was also found to be true by the federal court in *Erie Brush*, where they noted it was still necessary to consider the five *Taft* factors when deciding whether

impasse existed due to a single critical issue. *Erie Brush*, 700 F.3d at 21. It was also significant to the court that both parties understood bargaining to be at an impasse. It would therefore appear in instances where the NLRB had deviated from using the five *Taft* factors exclusively, both parties were generally of the opinion they had reached impasse. Here, the ILRB, for the first time, elected, without explanation, to rely upon the three-factor, single critical issue impasse test to conclude the parties had, in fact, reached "a good faith impasse." This not only constituted a substantial departure from its previous practice but was not consistent with the analysis still required by *CalMat Co.*, cited by the ILRB as authority for its election. The ILRB also stated, "In choosing to adopt the three-factor critical issue impasse test, we find it unnecessary to apply the five[-]factor test that the Board has previously utilized to determine the existence of an impasse."

¶ 28    The United States Supreme Court has frequently held "an agency must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 48 (1983). "[A]n agency changing its course must supply a reasoned analysis ***." *Greater Boston Television Corp. v. Federal Communications Comm'n*, 444 F.2d 841, 852 (D.C. Cir. 1970). "[I]t must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Board of Trade*, 412 U.S. 800, 808 (1973). As noted in *Atchison, Topeka & Santa Fe Ry. Co.*, an agency such as the NLRB "may articulate the basis of its order by reference to other decisions," as the ILRB did here. (Internal quotation marks omitted.) *Atchison, Topeka & Santa Fe Ry. Co.*, 412 U.S. at 807. However, although they referenced *CalMat Co.* as a basis for their reasoning, they failed to follow it.

¶ 29    In this case, the ILRB not only adopted for the first time the "single critical issue impasse test," it also gave no explanation for why it decided to do so in this instance, despite the ALJ's recommendation to the contrary. Without stating a reason, the ILRB stated simply:

> "To resolve this question, we adopt the NLRB's approach to single critical issue impasse and find that the parties reached single issue impasse on the critical issue of subcontracting. In light of this analysis, we decline to adopt the ALJ's package-by-package approach to determining the existence of an impasse and her proposed remedy of partial implementation, to which both parties strenuously excepted."

As we noted previously, the ILRB merely indicated by way of a footnote that the ILRB found it unnecessary to apply the five-factor test at all. In the ALJ's recommendation to the ILRB, she noted how the use of the *Taft* factors would lead the ILRB to a different result regarding the existence of an impasse. When applying the *Taft* factors, the record clearly established AFSCME did not have a "contemporaneous understanding" the parties were at an impasse. See *Taft*, 163 N.L.R.B. at 478.

¶ 30    On the morning of January 8, 2016, the Union presented CMS with a counteroffer on the issue of subcontracting. After the Union detailed the various concessions it had made in its counteroffer, CMS stated they did not have anything to give the Union at that point. According to the State's notes about the meeting, CMS followed by saying it was reviewing mandatory overtime, had been working on preparing for negotiation until late the previous evening, and had arranged a phone call at noon that day. The parties agreed to meet after the call, and the course of events when they reconvened in the afternoon evidenced a continued intention to

- 8 -

negotiate. The Union made a proposal regarding "DOC/DJJ Roll Call" after lunch at 1:10 p.m. CMS believed this to be a permissive topic and chose not to bargain. The Union made a health insurance proposal, followed by a proposal on wages and step increases. The Union made concessions by reducing the wage step percentages it had previously proposed but believed the State's plan of having a nonpensionable merit pay was unconstitutional. CMS shifted to a "Health and Safety" package and said it would not agree to a memorandum of understanding. The State proceeded to explain that why it believed the parties were at impasse was because they had engaged in 67 days and 24 sessions of bargaining and the Union seemed unwilling to budge on certain issues. We note the aforementioned reasons are not always indicative of an impasse. "[A]n impasse should not be mechanically inferred simply because the parties have failed to reach complete agreement after some specified number of negotiating sesions [*sic*] or whenever one party announces that his position is henceforth fixed and no further concessions can be expected (final offer.)" *Circuit-Wise, Inc.*, 309 N.L.R.B. 905, 919 (1992). Also, "[n]othing is more common during a negotiation than for one or both parties to make nonnegotiable demands. Usually this is bluffing, since if the negotiation is truly multifaceted, there is generally a price at which the parties will surrender these demands." *Duffy Tool & Stamping L.L.C. v. National Labor Relations Board*, 233 F.3d 995, 999 (7th Cir. 2000).

¶ 31    When CMS declared impasse, AFSCME representatives disagreed and reiterated many times the parties were not at an impasse. The Union was described in both sets of notes as saying it was "shocked and appalled" and had, or was working on, counters in those areas of alleged impasse. The Union went on to say that, earlier that day, it had accepted the State's $1000 bonus proposal in the "Wages and Steps" package. In both sets of notes, the Union stated at least three times it did not believe the parties were at impasse and it was not done bargaining. This is of particular significance since in most instances where the NLRB has chosen to utilize the "single critical issue impasse test," both parties have acknowledged their belief they were truly at impasse. Such is not the case here. Moreover, at no point in the negotiations, prior to declaring impasse, did CMS state it was near its bottom line. "The failure of a party to communicate to the other party the paramount importance of the proposals presented at the bargaining table or to explain that a failure to achieve concessions would result in a bargaining deadlock evidences the absence of a valid impasse." *Virginia Holding Corp.*, 293 N.L.R.B. 182, 183 (1989). For these and other reasons expressed herein, we do not believe the record adequately supports a finding of impasse.

¶ 32    Considering the legal impediments to impasse to be discussed later, under the *Taft* factors, the parties would not be at an overall impasse. At the outset of negotiations, the parties adopted a "package approach" whereby various bargaining issues were grouped into logical or otherwise related "packages." As topics within those packages were resolved, the parties would note a tentative agreement on that issue until either all issues in the package were resolved or they agreed to move remaining items to another package. This happened several times during the negotiation process. The fact that disagreement remained as to a particular issue did not mean the remaining issues within that package could not be resolved, nor did it mean an item could not then be moved to another package for resolution later. Under a *Taft* analysis of this bargaining process, a package-by-package analysis would not lead to a finding of an impasse unless it was clear that the only issues in the remaining packages were ones upon which neither side would negotiate further. The only way the two approaches can be reconciled is if the ALJ and the ILRB misapplied the test. Their analysis of the first two factors was

possibly correct. The parties may have been at an impasse on the issue of subcontracting at a given point in time, and the parties considered subcontracting a critical issue. However, the ALJ explained how "packaging" proposals aided in the resolution of bargaining issues as the process developed. It was also clear from the record, AFSCME was very interested in watching how negotiations proceeded with other bargaining units in the state, and it was impossible to determine, at the stage negotiations were in when CMS declared impasse, whether further movement might become possible as packages were either resolved or reconstructed. As we stated above, despite citing *CalMat Co.* for the "single critical issue impasse test," the ILRB failed to apply the test as outlined in that case.

¶ 33    We believe the ILRB's conclusion that the "single critical issue impasse test" allowed them to disregard the *Taft* factors was in error. Such a position effectively rejects the body of cases and NLRB decisions they cite in support. Although our conclusion necessitates a remand, for purposes of clarity, we discuss some of the other issues relative to application of the "single critical issue impasse test" as they relate to this case. Both the ALJ and the ILRB reasoned no new CBA could be reached without agreement on the single issue of subcontracting and that such a finding was sufficient to meet the requirements of the third element; namely, that further negotiations were meaningless without resolution of this single issue, as a breakdown in negotiations. This reasoning conflates the first two elements with the third, rendering it superfluous. Assuming the parties could not resolve the particular issue of subcontracting, at that particular point in time, it did not mean they were unable, or would be unable, to resolve a number of other issues at the same time. In addition, as we said, the record reveals AFSCME was particularly concerned with the progress of negotiations with other bargaining units on this same issue. Contrary to the interpretation rendered by the ALJ and the ILRB, the reasoning in *CalMat Co.*, 331 N.L.R.B. at 1097, must apply. The third element is found to exist when "there can be no progress on any aspect of the negotiations" until the impasse on the critical issue is resolved *CalMat Co.*, 331 N.L.R.B. at 1097. For example, the NLRB has concluded in certain situations there can be no contract regardless of resolution of all other issues because it is clear from the language of the parties that there will be no resolution of this issue. *Stein Industries, Inc.*, 365 N.L.R.B. No. 31, slip op. at 4 (2017) (slip opinion); see also *Erie Brush*, 700 F.3d at 23 ("Because 'the parties' failure to agree on this issue destroyed any opportunity for reaching a ... collective-bargaining agreement' [citation], the impasse on [even one of the outstanding issues] led to a breakdown in overall negotiations." (quoting *CalMat Co.*, 331 N.L.R.B. at 1098)). The ALJ's determination no progress could be made was premature and belies the record. As recently as January 7, 2016, the day before CMS declared impasse, the parties had reached an agreement on a "Miscellaneous Pay Provisions" package. This is not indicative of a complete breakdown in negotiations. See *Sierra Publishing Co.*, 291 N.L.R.B. at 557 (finding no impasse where the parties had reached agreement on numerous packages the day before and neither party evidenced a belief that impasse was imminent).

¶ 34    We note in cases where a single critical issue was found to cause a complete breakdown and courts found "there can be no progress on any aspect of the negotiations," the parties made it abundantly clear through their language at the bargaining table. *CalMat Co.*, 331 N.L.R.B. at 1097; see also *Erie Brush*, 700 F.3d at 23. In *CalMat Co.*, where impasse was reached on the critical issue of pensions, the employer stated it was unwilling to make *any* concessions until the union got "off [their]…damn pension plan." *CalMat Co.*, 331 N.L.R.B. at 1093. In *Erie Brush*, the parties reached impasse on the issue of union security, and each side stated on

numerous occasions it was unwilling to concede the issue and a contract would not be finalized unless its view of the issue was incorporated. Additionally, in *Erie Brush*, it was the last noneconomic package for the parties to discuss, and they stated they would not move to economic packages until this issue was resolved. *Erie Brush*, 700 F.3d at 23. In *Paulsen v. All American School Bus Corp.*, 967 F. Supp. 2d 630, 642-43 (E.D.N.Y. 2013), the court stated there was "no complete breakdown in the entire negotiations," where there was substantial movement on important topics because it showed the bargaining process was still viable when impasse was declared. (Internal quotation marks omitted.)

¶ 35    Here, while the parties were moving slowly toward an agreement, progress was still being made in other areas of the negotiation. In addition, the negotiation process had to be considered in its entirety. These parties started slowly and were in substantial disagreement from the outset. As noted above, the ALJ found the negotiation process between these two sides started and progressed differently than they ever had before, which is further evidence of the relevance of the *Taft* factors, since the bargaining history of the parties is a factor to be considered.

¶ 36    For all of these reasons, we must remand this case to the ILRB in order to provide them an opportunity either to explain their reasoning for departing from their long-standing practice of using the *Taft* factors test as the exclusive means of assessing whether parties have reached an impasse or to use those same factors as they have done previously to reach a decision. See *Motor Vehicle Manufacturers Ass'n of the United States, Inc.*, 463 U.S. at 48; see also *Atchison, Topeka & Santa Fe Ry. Co.*, 412 U.S. at 822 (finding if a reviewing court cannot discern the policies the agency is pursuing by departing from its prior decisions, "it may remand the case to the agency for clarification and further justification of the departure from precedent"). "[I]t is the agency's responsibility, not [the reviewing court's], to explain its decision." *Motor Vehicle Manufacturers Ass'n of the United States, Inc.*, 463 U.S. at 57. It is within the ILRB's discretion whether to adopt the reasoning of the ALJ's findings and recommendation, but if it chooses to depart from it, the ILRB must make clear its awareness of the ALJ's recommendation *and* its reasons for taking a different course. See *Greater Boston Television Corp.* 444 F.2d at 853. The ILRB merely acknowledged the ALJ's recommendation, but that was not enough. Contrary to the State's argument, it does not matter that the ILRB was merely changing course rather than abandoning the impasse test outright; both require explanation from the ILRB.

¶ 37    At oral arguments, the State sought to remind us we can affirm on any basis within the record and gave additional reasons for the ILRB's actions, asking us to review the ILRB's decision anew. However, "the courts may not accept appellate counsel's *post hoc* rationalizations for agency action. [Citation.] It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Manufacturers Ass'n of the United States*, 463 U.S. at 50.

¶ 38    Although there were additional arguments presented by the parties regarding the finding of an impasse, since we are vacating the ILRB's order and remanding to permit it an opportunity to either explain why it departed from previous practice or to apply the *Taft* factors in accordance with its precedent, we need not consider them here. We will however discuss those issues that impact the remand of the proceedings to the ILRB.

¶ 39                          B. Unfair Labor Practices

¶ 40        AFSCME and CMS allege the ILRB erred in its findings with regard to the unfair labor practices listed below. Our review of these contentions of error is under the clearly erroneous standard. See *Fraternal Order of Police, Chicago Lodge No. 7 v. Illinois Labor Relations Board*, 2011 IL App (1st) 103215 ¶ 18, 961 N.E.2d 855. This standard "accords substantial deference to the administrative decision, in acknowledgment of the agency's experience and expertise in resolving matters within its purview." *Fraternal Order of Police, Chicago Lodge No. 7*, 2011 IL App (1st) 103215, ¶ 18. "[T]he agency decision will be deemed 'clearly erroneous' only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395, 763 N.E.2d 272, 282 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 41                                1. *Direct Dealing*

¶ 42        AFSCME contends the ILRB erred in not finding CMS engaged in direct dealing. We disagree.

¶ 43        The question of whether an employer engaged in direct dealing involves a mixed question of law and fact. *American Pine Lodge Nursing & Rehabilitation Center v. National Labor Relations Board*, 164 F.3d 867, 880 (4th Cir. 1999). "The fact that an employer chooses to inform employees of the status of negotiations, or of proposals previously made to the union, or of its version of a breakdown in negotiations will not alone establish a failure to bargain in good faith." *American Federation of State, County & Municipal Employees, Council 31*, 10 PERI ¶ 3031 (ILLRB 1994) (*City of Chicago (Department of Public Health)*). "[C]ommunication with employees is unlawful when the context of the conversation is not to inform employees but rather to have the effect of coercing the employees from exercising their right to bargain through the representative of their choosing." *Tri-State Professional Firefighters Union Local 3165*, 32 PERI ¶ 153 (ILRB State Panel 2016). Examples of improper direct dealing include "efforts at reaching a separate agreement with employees; enlisting support of employees through threats of reprisal or promises of benefit and; [*sic*] inducing employees to withdraw from the union." *Tri-State Professional Firefighters*, 32 PERI ¶ 153. Communications are not unfair labor practices or evidence of an unfair labor practice unless a reasonable employee would view the communications as conveying a threat of reprisal or force or promise of benefit. *American Federation of State, County, & Municipal Employees, Council 31*, 11 PERI ¶ 2016 (ISLRB 1995) (*City of Mattoon*).

¶ 44        "[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of a charge with the Board ***." 5 ILCS 315/11(a) (West 2014). As was noted by the ALJ, AFSCME filed their complaint with the ILRB on February 22, 2016, and since a number of the allegations fall outside the six-month period, they are untimely and the ILRB had no jurisdiction to consider them, and neither do we. Therefore, we cannot review any unfair labor practice allegations prior to August 22, 2015. It is appropriate, however, to examine even the untimely allegations when considering the context of the parties' bargaining history in its entirety. In this way, we can determine whether, during the six-month period prior to the filing of the unfair labor practice charge, the respondent was bargaining in good faith. *Tri-State Professional Firefighters*, 31 PERI ¶ 78 (ILRB State Panel 2014).

¶ 45        Here, the ALJ separated the allegations of unlawful direct dealing into two categories. The first related to "away from the table communications," including (a) statements from the governor's office about other trade union contracts; (b) the Crain's September 2015 business article; (c) the State's response to a Union bargaining bulletin published on CapitalFax.com on October 6, 2015; (d) a December 11, 2015, letter regarding health care; and (e) the Barclay memorandum of January 6, 2016. The second category involved the "Employee Engagement Survey." The ALJ noted how the Union relied on the three-part test used by the NLRB to assess the direct-dealing allegations, namely (1) direct communication by the employer with union-represented employees; (2) the purpose of the discussion being either the establishing or changing of wages, hours, and terms and conditions of employment or to undercut the Union's role in bargaining; and (3) the communications excluded the Union. The ALJ opted not to follow the NLRB's analysis, which had never been expressly incorporated by the ILRB. She chose instead to analyze these "away from the table communications" by the standard for direct dealing found in *Tri-State Professional Firefighters*, 32 PERI ¶ 153. In that case, the ILRB required the Union to show by a preponderance of the evidence the communication from the employer had the effect of coercing the employees, preventing them from exercising their right to bargain through the representative of their choosing. This meant they had to show:

> "(1) the employee engaged in union and/or protected, concerted activity; (2) that the employer knew of this conduct; and (3) that the employer took an adverse employment action against the employee, in whole or in part, because of anti-union animus, or that the protected conduct was a substantial or motivating factor in the adverse action." *Tri-State Professional Firefighters*, 32 PERI ¶ 153.

The ILRB adopted the same analysis in their order. Addressing first the comments from the governor's office, in several different communications, during the period of collective bargaining, the governor and others on his staff said AFSCME continued to reject certain proposals that were accepted by other trade unions. The ILRB described this as a statement of CMS's " 'version of a breakdown in negotiations,' " (quoting *Fraternal Order of Police, Lodge 7*, 26 PERI ¶ 115 (ILRB Local Panel 2010)), which is permissible under both NLRB and ILRB case law. The ALJ found the statements were not "so detrimental to the Union's ability to function" and did not "undermine their role as the exclusive representative as to run afoul of the [Illinois Public Labor Relations] Act." The ALJ also found these comments, as well as those relating to the State's financial difficulties in relation to pension funding, fell within the "safe harbor" provisions of section 10(c) of the Illinois Public Labor Relations Act. 5 ILCS 315/10(c) (West 2014). Section 10(c) of the Illinois Public Labor Relations Act permits the expression or dissemination of "views, argument, or opinion" so long as they "contain[ ] no threat of reprisal or force or promise of benefit." 5 ILCS 315/10(c) (West 2014). It also says such statements "shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act." 5 ILCS 315/10(c) (West 2014). The ALJ noted how, at the same time, the Union was likewise characterizing the State as maintaining "extreme," "radical and harmful demands" and simply attempting to lessen the rights of unions. Unlike potentially actionable statements directed solely at members of the Union, the comments by the governor's office were public and made both to CMS and AFSCME, as well as everyone else in the state. They met none of the other criteria for direct dealing, and as a result, they were protected by section 10(c) of the Illinois Public Labor Relations Act. The Crain article, of which the Union complained, was published in September 2015. It stated the administration

- 13 -

was willing to provide a merit-pay pool "amounting to 2 percent of payroll each of the next four years." At the bargaining session, after the article's publication, CMS made its merit pay proposal establishing a bonus pool equal to 2% of payroll for each of the four years of the successor CBA. The ALJ compared the situation to *American Federation of State, County & Municipal Employees, Council 31*, 31 PERI ¶ 160 (ILRB State Panel 2015) (*County of Kankakee*), where the ILRB noted a direct dealing violation "lies in *bypassing* the representative" and attempting to reach an agreement directly with employees. (Emphasis in original.) Here, the ALJ said, the State was not attempting to reach an agreement directly with employees, and there was no statement by any person in an official capacity, which conveyed a threat of reprisal or promise of benefit. The CapitolFax.com posts were in response to posts by AFSCME that said CMS was demanding a merit pay "scheme" and listed proposals to which AFSCME claims CMS made "virtually no change." The governor's administration responded by saying AFSCME members should ask their leaders to "start telling them the truth" because the bulletin was false and misleading. The administration's post also refuted parts of the previous article to which they took exception. The ALJ concluded the information presented by the State was not blatantly false and was made to correct what it believed were inaccuracies presented to the public by AFSCME. The ALJ found the posted article fit into the "safe harbor" exception of section 10(c) of the Illinois Public Labor Relations Act. On December 11, 2015, CMS sent a letter to employees regarding health insurance wherein they mentioned "considerable misinformation" being provided to them "in recent weeks" and outlined some of the anticipated changes to health insurance premiums as a result of federal insurance requirements. The letter went on to say the State expected employees would be able to remain on existing health care plans, and the State intended to reach an agreement on health care where they would continue paying the majority of active employees' health care costs and 100% of the premiums for retirees. Although initially characterized as a separate unfair labor practice, the ALJ noted how the Union's post-hearing brief considered the letter to be "evidence of bad faith." The ALJ found the letter informative, not threatening or coercive, and similar to other letters employees were accustomed to seeing whenever benefit choice periods or changes in health care occurred. The January 6, 2016, memorandum to agency directors from Jason Barclay, general counsel for the governor, discussed the State's employee compensation proposals, including the use of bonuses, gainsharing, and merit pay, while also proposing to stop automatic step increases until the State's overall budget picture improved. The memo announced the State was implementing the new program with merit employees and the 17 labor unions who had already signed CBAs in 2015. It also provided an "update" on the merit pay proposal to AFSCME. The Union's chief complaint regarding this memo had to do with Family and Medical Leave Act of 1993 (FMLA) (29 U.S.C. § 2601 *et seq.* (2012)) leave and missed days of work. The ALJ properly found this was simply a matter of either a misunderstanding or clarification and was not indicative of any effort on the part of the State to bypass the Union. The memo was simply providing information on employee compensation proposals.

¶ 46    With regard to the second category, the employee surveys, the ILRB acknowledged there was no precedent on such surveys but accepted the ALJ's conclusion there was no direct dealing. Finding neither NLRB nor ILRB case law on employee surveys, the ALJ concluded since there was no indication the information solicited directly from employees was intended to induce them to withdraw from the Union, or was attempting to negotiate separately from the

Union, the survey did not constitute direct dealing. The ALJ noted the Union failed to even raise such an argument in their post-hearing brief. The survey was not coercive, a significant focus of the ILRB's inquiry in direct-dealing cases of this type, and she found the questions innocuous and not derogatory toward the Union. The fact that some questions might have related to matters that were the topic of collective bargaining was not of significance since not even the Union's witnesses believed they were an effort to reach a separate agreement with employees absent the Union. The ALJ also found the survey was not an effort to either gain the support of the Union members or serve as some sort of threat of reprisal, and therefore it failed to fulfill any of the requirements for direct dealing by means of communication with employees. The ILRB agreed, and since we agree with both the ALJ's and the ILRB's analysis, we do not find the ILRB's ruling was clearly erroneous.

¶ 47                                    2. *Tolling Agreement*

¶ 48        CMS contends the ILRB erred in finding AFSCME did not repudiate the "Tolling Agreement" between the parties while AFSCME argues the ILRB did not have jurisdiction to review the alleged breach of contract. We disagree with both.

¶ 49        Generally, the ILRB lacks jurisdiction to enforce negotiated agreements, such as CBAs or grievance settlements. *Amalgamated Transit Union, Local 241*, 32 PERI ¶ 161 (ILRB Local Panel 2016). However, in certain circumstances, the contractual breach is "substantial enough to indicate a 'repudiation' or 'renunciation' of the collective bargaining agreement or bargaining obligation, and therefore a unilateral change in the employees' working conditions which would violate Section 10(a)(4) of the [Illinois Public Labor Relations] Act." *Fletcher*, 3 PERI ¶ 2063 (ISLRB 1987). "[I]f the parties' negotiations result in a 'legitimate impasse,' the employer may unilaterally implement changes in the employees' terms and conditions of employment consistent with its pre-impasse proposals." *City of Peoria*, 11 PERI ¶ 2007. Impasse does not permanently release a party from its duty to bargain collectively in good faith. *City of Peoria*, 11 PERI ¶ 2007. The existence of an impasse is "only a temporary deadlock or hiatus in the parties' negotiations." *City of Peoria*, 11 PERI ¶ 2007.

¶ 50        The language of the "Tolling Agreement" states, "The parties may either mutually agree that an impasse exists or, if a dispute exists with respect to the existence of an impasse, the parties agree to submit the matter to the Illinois Labor Relations Board." The "Tolling Agreement" limited the State's ability to implement their last, best, and final offer by first requiring the issue to be submitted to the ILRB if the parties did not believe an impasse had been reached. As this language directly impacts the bargaining obligation of the parties, we find the ILRB has jurisdiction to review the allegation. The next question is to determine whether the ILRB erred in finding the "Tolling Agreement" was not repudiated.

¶ 51        As the ALJ stated, the language in the "Tolling Agreement" has no specific terms for time and manner of submission to the ILRB. The State's argument would require us to conclude the Union's failure to immediately acquiesce to their assertion of the existence of an impasse somehow constituted a repudiation of the "Tolling Agreement" in its entirety. If anything, their failure to do so weighs more heavily toward the conclusion they did not believe the parties had, in fact, reached a true impasse in negotiations. The ALJ noted how the very terms of the "Tolling Agreement" contemplates the parties were in disagreement over whether a good-faith impasse had been reached. AFSCME submitted it to the ILRB after CMS filed its complaint of unfair labor practices, a delay of five weeks, during which the parties attempted to continue

negotiating. Without specificity in the contract, we cannot say the ILRB's ruling was clearly erroneous.

¶ 52                                        3. *Information Requests*

¶ 53        CMS argues the ILRB erred in finding CMS committed an unfair labor practice by not responding to AFSCME's information requests. We disagree.

¶ 54        The duty to supply relevant information is a "fundamental obligation." *Oil, Chemical & Atomic Workers Local Union No. 6-418 v. National Labor Relations Board*, 711 F.2d 348, 358 (D.C. Cir. 1983). The relevance standard for information requests is "a liberal discovery-type standard, under which the requested information need only be relevant to the union in its negotiations." *United States Testing Co. v. National Labor Relations Board*, 160 F.3d 14, 19 (D.C. Cir. 1998); see also *Chicago Regional Council of Carpenters, Local 13*, 23 PERI 120 (ILRB Local Panel 2007) (a broad range of potentially useful information should be allowed the union for the purpose of effectuating the bargaining process). Most importantly for our analysis here, as the ALJ noted, the NLRB has made it clear parties may not claim a lawful impasse if they have failed to provide information considered relevant to those issues upon which they disagree because this effectively frustrates the bargaining process. It would only make sense one side cannot claim an impasse in negotiations when they have failed to provide information that could either resolve the issues separating the two sides or better explain why a particular position is taken. "A legally recognized impasse cannot exist where the employer has failed to satisfy its statutory obligation to provide information needed by the bargaining agent to engage in meaningful negotiations." *Decker Coal Co.*, 301 N.L.R.B. 729, 740 (1991); see also *E.I. du Pont de Nemours & Co.*, 346 N.L.R.B. 553, 558 (2006) ("It is well settled that a party's failure to provide requested information that is necessary for the other party to create counterproposals and, as a result, engage in meaningful bargaining, will preclude a lawful impasse."). In addition, as was noted by the ALJ, in *Decker Coal Co.*, the NLRB found that, even if the information was provided, a legally recognized impasse could not be declared until the opposing side had a reasonable opportunity to analyze the information provided and formulate a proper counteroffer. *Decker Coal Co.* 301 N.L.R.B. at 740 (citing *Storer Communications Inc.*, 294 N.L.R.B. 1056 (1989)). The ILRB adopted both the finding and analysis of the ALJ on this issue and we find no reason in the record to decide otherwise.

¶ 55        Here, AFSCME submitted a number of information requests regarding issues, such as merit pay, wages, and health insurance, which were never answered by CMS. AFSCME requested examples of "high performance"—the very standard CMS sought to implement for merit pay. Throughout negotiations, AFSCME expressed concerns about how "high performance" would be measured, especially in certain jobs such as correctional officers, where the nature of the work performed by the same officers depended on the duties to which they were assigned at different times. With regard to health care, the Union sought information about other potential cost saving initiatives and requested information on savings for the State as a result of the increases to out-of-pocket costs for employees. In discussions regarding the "Vacation, Holidays, and Leave of Absence" package, AFSCME requested information on the net cost savings of their January 6 proposal. Lastly, in the "Underutilization" package, the Union sought information previously provided in the 2012 CBA discussions but was not provided in the ongoing discussions in a timely fashion. Although the ALJ found the failure to provide the requested information did not actually hinder the Union's ability to respond, the

State's final release of information came in mid-December, and there was not sufficient time for its consideration before CMS declared impasse on January 8, 2016. All this was relevant to the Union, and the ALJ disagreed with CMS, concluding the requests were made in good faith. This is further supported by the fact AFSCME had not been forewarned of the imminence of a declaration of impasse by the employer. It was not unreasonable for the Union to seek verifying information from CMS since in most instances what they proposed as either a "cost-savings" or "improved efficiency" was based on information held exclusively by them. For example, if figures were provided, which CMS performed calculations they claimed as evidence of cost-saving, it would not be unreasonable for the Union to want to perform the computation itself to verify the accuracy of those provided. In a number of instances, the ALJ concluded, and the ILRB agreed, the State acknowledged their intent to provide the information requested but either failed to do so entirely or did so in an untimely fashion. Since the information sought was relevant to the negotiation process, we agree it was not clear error to find CMS engaged in an unfair labor practice by failing to supply it.

¶ 56                  C. ALJ Permitting the Prefiling of Direct-Examination Testimony
                                         in Lieu of Live

¶ 57        AFSCME contends the ILRB erred in affirming the ALJ's decision to allow CMS to present witnesses in its case in chief and on rebuttal through affidavits. We agree.

¶ 58        The ALJ's decision to allow submission of direct examination testimony by way of affidavit is judged under the clearly erroneous standard of review. *Department of Central Management Services/Illinois Commerce Comm'n v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 766, 767, 943 N.E.2d 1136, 1138 (2010). "Under this standard of clear error, we will uphold the Board's decision unless our review of the entire record leaves us with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 770.

¶ 59        " 'Testimony' is '[e]vidence that a competent witness under oath or affirmation gives at trial *or in an affidavit* or deposition.' " (Emphasis in original.) *Aich v. City of Chicago*, 2013 IL App (1st) 120987, ¶ 17, 991 N.E.2d 830 (quoting Black's Law Dictionary 1613 (9th ed. 2009)). "Similarly, a 'witness' is '[o]ne who gives testimony under oath or affirmation (1) in person, (2) by oral or written deposition, *or (3) by affidavit*." (Emphasis in original.) *Aich*, 2013 IL App (1st) 120987, ¶ 17.

¶ 60        "Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and is generally inadmissible unless it falls within an exception." *People v. Lawler*, 142 Ill. 2d 548, 557, 568 N.E.2d 895, 899 (1991). Hearsay evidence is generally inadmissible in an administrative proceeding. *WISAM 1, Inc. v. Illinois Liquor Control Comm'n*, 2014 IL 116173, ¶ 46, 18 N.E.3d 1; *Slocum v. Board of Trustees of the State Universities Retirement System*, 2013 IL App (4th) 130182, ¶ 35, 1 N.E.3d 102. In certain circumstances, testimony by sworn affidavit is allowed. *Aich*, 2013 IL App (1st) 120987, ¶ 13; see also *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 770 ("a hearing could be 'written' in the sense that parties could be heard solely through their presentation of written arguments and documentary evidence to the agency"). However, in those instances, the administrative rules permitted the admission of affidavits, relaxed the rules of evidence, and permitted hearsay evidence.

¶ 61    In *Aich*, the court noted how, under the City of Chicago's "General Rules and Regulations," " 'the formal and technical rules of evidence shall not apply in the conduct of administrative hearings.' " *Aich*, 2013 IL App (1st) 120987, ¶ 13 (quoting City of Chicago General Rules and Regulations § 1.7 (eff. July 14, 1997)). The rules also specifically permitted the limited use of hearsay evidence "only if it is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs." *Aich*, 2013 IL App (1st) 120987, ¶ 13 (quoting City of Chicago General Rules and Regulations § 1.7 (eff. July 14, 1997)). Further, the Chicago Municipal Code applied as well, which stated, "Subject to subsection (j) of this section, the administrative law officer may permit witnesses to submit their testimony by affidavit or by telephone." Chicago Municipal Code § 2-14-076(g) (amended Apr. 29, 1998). In subsection (j), it states, "Upon the timely request of any party to the proceeding, any person, who the administrative law officer determines may reasonably be expected to provide testimony which is material and which does not constitute a needless presentation of cumulative evidence, shall be made available for cross-examination prior to a final determination of liability." Chicago Municipal Code § 2-14-076(j) (amended Apr. 29, 1998). In *Department of Central Management Services/Illinois Commerce Comm'n*, the rules of the Illinois Commerce Commission applied, which stated, in section 200.660, "It is the policy of the Commission to encourage the advance submission of testimony and exhibits by all parties and staff witnesses." 83 Ill. Adm. Code 200.660 (2014).

> "An administrative agency possesses no inherent or common law powers, and any authority that the agency claims must find its source within the provisions of the statute by which the agency was created. *Illinois Local Labor Relations Board*, 302 Ill. App. 3d at 686-87, 707 N.E.2d at 179. Accordingly, the authority of an administrative agency to adopt rules and regulations is defined by the statute creating that authority, and such rules and regulations must be in accord with the standards and policies set forth in the statute." *Department of Revenue v. Civil Service Comm'n*, 357 Ill. App. 3d 352, 363, 827 N.E.2d 960, 969-70 (2005).

¶ 62    However, in the case before this court, the ILRB and the ALJ by extension are limited by their rules in the Illinois Public Relations Act and the Illinois Administrative Code. Section 5(f) of the Illinois Public Labor Relations Act states:

> "In order to accomplish the objectives and carry out the duties prescribed by this Act, a panel or its authorized designees may hold elections to determine whether a labor organization has majority status; investigate and attempt to resolve or settle charges of unfair labor practices; hold hearings in order to carry out its functions; develop and effectuate appropriate impasse resolution procedures for purposes of resolving labor disputes; require the appearance of witnesses and the production of evidence on any matter under inquiry; and administer oaths and affirmations. The panels shall sign and report in full an opinion in every case which they decide." 5 ILCS 315/5(f) (West 2014).

Section 1200.130 of the Illinois Administrative Code states, "[T]he Administrative Law Judge will, insofar as practicable, apply the rules of evidence applicable in Illinois courts." 80 Ill. Adm. Code 1200.130 (2003). Therefore, unlike the situation in *Aich*, the default position for ALJs is the rules of evidence. Here, the ALJ permitted affidavits of clearly available witnesses, as each witness was cross-examined in the hearing. The affidavits were out-of-court statements offered for the truth of the matter asserted and did not fit under any of the established

exceptions to the rules against hearsay. While they may constitute admissible evidence in proceedings where the rules of evidence have been relaxed, or are otherwise admissible as a result of the rules or regulations by which the agency functions, there is no provision for the use of such evidence in proceedings such as these. Although judicial and administrative efficiency is desired, it cannot overrule the basic foundations of evidence.

¶ 63 Moreover, we believe the ALJ's analysis of applicable case law was in error. The ALJ allowed the submission of prefiled direct evidence instead of live testimony, citing *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 770. In that case, this court stated, "[T]he denial of an oral hearing is not necessarily the denial of a hearing," as a hearing could be conducted by presentation of written arguments and documentary evidence to the agency. *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 770. The distinction, which appears to have been missed by the ALJ, was that we were comparing the process of a "representation hearing" to a summary judgment proceeding, wherein the function of the ALJ, at that point, was to ascertain whether there were any fatal deficiencies in either party's case. It constituted the pretrial process and did not take the position of an actual administrative trial. See *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 773. Finding there were unresolved issues as to whether the respondents were managerial employees, we ruled the denial of an oral hearing was clearly erroneous. *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 767. Nothing about our holding or analysis in *Department of Central Management Services/Illinois Commerce Comm'n* approved waiving the basic rules of evidence.

¶ 64 For this reason, the case before us is factually distinguishable from the *Department of Central Management Services/Illinois Commerce Comm'n*. In the prior case, the ALJ was tasked with seeing if there was enough information to proceed, whereas here, the ALJ was tasked with making factual determinations, suggesting applications of law, and making a recommendation for ruling. Because representation cases are nonadversarial fact-findings, "credibility concerns are not at issue." *Chief Judge of the 11th Judicial Circuit*, 16 PERI ¶ 2043 (ISLRB 2000).

¶ 65 However, when the ILRB receives an unfair labor charge, its first duty is to investigate whether there is an issue of law or fact sufficient to warrant a hearing. *Michels v. Illinois Labor Relations Board*, 2012 IL App (4th) 110612, ¶ 44, 969 N.E.2d, 996. If the ILRB finds an issue sufficient to warrant a hearing, the ILRB will set the complaint for a hearing. *Michels*, 2012 IL App (4th) 110612, ¶ 44. In the hearing, the hearing officer makes credibility determinations, evaluating, among other things, the witness's demeanor while testifying. See *Board of Regents of Regency Universities v. Illinois Educational Labor Relations Board*, 208 Ill. App. 3d 220, 230, 566 N.E.2d 963, 970 (1991). The ALJ found providing the parties the opportunity for cross-examination would allow her to adequately make credibility determinations. We disagree. We note it is the established policy of the NLRB to not accept affidavits, as it affords no opportunity to cross-examine or evaluate demeanor. *Limpco Manufacturing Inc.*, 225 N.L.R.B. 987, 987 n.1 (1976). The ability to cross-examine alone does not enable the ALJ to determine credibility, as the evaluation of a witness's demeanor and assessment of credibility includes how he or she responds to questions on direct examination as well as cross-examination. Any trial lawyer can relate instances where even the best prepared witness fails to answer a question on direct examination as expected or exhibits a demeanor during

questioning by his or her own counsel that clearly comes across as insincere or disingenuous. Judges make credibility determinations during both direct and cross-examination, and opposing counsel has the opportunity to follow up on cross-examination based upon how the questions were answered on direct. Cross-examining an affidavit prepared over time, either by or at the direction of counsel, will not produce the same results. Here, the Union was limited to questioning the affiants based only on the contents of their affidavits. Rather than help expedite the process, as was its intended purpose, if anything, the record would tend to support the conclusion the use of direct-examination affidavits merely required opposing counsel to engage in even more detailed questioning. Further, it deprived the ALJ of the opportunity to assess the credibility of the witnesses during direct examination and has no basis in the rules of evidence. For these reasons, we find the ALJ's decision to accept prefiled, direct evidence was clearly erroneous.

¶ 66                                   D. Statutory Rights

¶ 67        CMS argues its last, best, and final offer did not require a waiver of the statutory rights to pension calculation, subsidized health insurance, and retiree health insurance, as the ALJ suggested. As we are remanding this case to the ILRB for proceedings consistent with this opinion, we decline to rule on this question since the answer is dependent on whether the ILRB determines impasse was reached.

¶ 68                                   III. CONCLUSION

¶ 69        For the reasons stated, we vacate the ILRB's order and remand for proceedings consistent with this opinion.

¶ 70        Board decision vacated and remanded for further proceedings.